## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

**TRACY AHMAD ALSHURAFA,**

      **Plaintiff,**

**v.**                               **Case No. 1:20-cv-00546**

**CAPTAIN WIMBISH, et al.,**

      **Defendants.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

Plaintiff, Tracy Ahmad Alshurafa (hereinafter also referred to as "Alshurafa"), proceeding *pro se* and currently incarcerated at the United States Penitentiary in Victorville, California, seeks damages under *Bivens v. Six Unknown Federal Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971), for alleged violations of his civil rights that occurred when he was an inmate at Federal Correctional Institution ("FCI") McDowell. This matter is assigned to the Honorable David A. Faber, United States District Judge, and by standing order has been referred to the undersigned United States Magistrate Judge for total pretrial management and submission of proposed findings of fact and recommendations for disposition ("PF&R") pursuant to 28 U.S.C. § 636(b)(1)(B).

Currently pending is Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment. (ECF No. 21). Alshurafa was given notice pursuant to *Roseboro v. Garrison,* 528 F.2d 309 (4th Cir. 1975), of his right and obligation to respond to the combined motion to dismiss and motion for summary judgment. (ECF No. 25). In

addition, the Court held a motion hearing on April 29, 2021 with Alshurafa attending by videoconference. (ECF No. 31). At the hearing, Defendants were ordered to produce relevant documents, which were made available to Alshurafa for review. (ECF Nos. 32, 33). Alshurafa was given additional time to respond to the pending motion; however, more than forty-five days have passed since the materials were produced by Defendants, and no response from Alshurafa has been forthcoming. Accordingly, Defendants' motion is ready for disposition. After thoroughly considering the arguments and supporting materials, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, (ECF No. 21); **DISMISS** the amended complaint, with prejudice, (ECF No. 5); and **REMOVE** this case from the docket of the Court.

## I.    Plaintiff's Complaint

Alshurafa alleges that on the afternoon of June 22, 2020, he covered his cell window in an effort to speak with a Captain about the failure of correctional officers to deliver commissary orders to him and other inmates on his range. At the time, Alshurafa was housed in the A range of the special housing unit ("SHU") at FCI McDowell. (ECF No. 5 at 4). Alshurafa claims that only the inmates on A range were overlooked during commissary delivery. He states that commissary orders are filled once every two weeks and include items such as postage stamps. Consequently, if orders are not delivered as scheduled, the affected inmates have to wait at least one month between orders, effectively preventing them from writing to their family members.

Alshurafa indicates that Correctional Officer Kendricks and Counselors Lily and Stocks came to speak with Alshurafa, and he removed the window covering to talk with them. (*Id*. at 5). He explained to them that he specifically wanted to speak with a Captain,

2

because he wanted to discuss the problem with someone in authority. Defendant Lieutenant Connelly arrived at Alshurafa's cell and instructed him to remove the window covering. (ECF No. 5 at 5). Alshurafa refused to comply and again stated that he wanted to speak with a Captain. (*Id*.). Lieutenant Connelly left and subsequently returned with a team of correctional officers. Connelly shouted at Alshurafa to remove his window covering and cuff up. According to Alshurafa, he took the covering down, but one of the officers nonetheless sprayed him with OC spray. (*Id*.) Alshurafa argues that spraying him was unnecessary, as he did not resist or show violent behavior, and, thus, the spraying was the use of excessive force in violation of his constitutional rights. (*Id*.).

After being sprayed, Alshurafa was removed from his cell and taken to the shower. He was then stripped naked and the officers assisted him in donning paper boxer shorts and a paper jumpsuit. (*Id*. at 6). Alshurafa claims that the boxers were too small and left his genitals exposed. Because the jumpsuit was see-through, Alshurafa's genitals remained exposed and were apparent to three female officers present at the scene, including Defendant Wimbish. Alshurafa states that he was sexually embarrassed and humiliated, so he filed an allegation that Wimbish and Connelly violated the Prison Rape Elimination Act ("PREA"). (*Id*.). As an aside, Alshurafa complains that the psychologist at FCI McDowell had yet to speak with him, although several months had passed since the episode.

Alshurafa indicates that after he was dressed in the paper boxers and jumpsuit, he was place in handcuffs. (*Id*. at 7). The cuffs were so tight that his right hand began to turn purple. Alshurafa complained about the cuffs until they were loosened somewhat, but they were still too tight. He was placed in a cell with no toilet paper and half of a mattress and remained there, in handcuffs, for ten hours. (*Id*.). Although he told Defendant

Lieutenant Johnson that he needed to use the restroom, Johnson did nothing to help him. Alshurafa states that his right hand was so swollen that when the cuffs were finally removed, he was unable to make a fist and a scar appeared at the site of the cuffs. (ECF No. 5 at 7). Alshurafa claims that Johnson was deliberately indifferent to his needs, violating the Eighth Amendment prohibition against cruel and unusual punishment. (*Id.* at 7-8). Alshurafa states that he suffered physical and emotional scarring from the events. He also alleges that he has been the subject of taunting by correctional officers since June 22, 2020, and that they have made it very difficult for him to file grievances and exhaust the grievance procedure. For relief, Alshurafa asks for "disciplinary action upon Defendants, as well as financial compensation for the mental, and physical damages." (*Id.* at 9).

## II.  **Defendants' Motion**

Defendants argue that the complaint should be dismissed on four separate grounds, including the following:

1.  Plaintiff failed to exhaust administrative remedies;

2.  Plaintiff's allegations are not cognizable under *Bivens;*

3.  Plaintiff's claims should be dismissed pursuant to 28 U.S.C. § 1915A; and

4.  Defendants are entitled to qualified immunity.

Under the third ground, Defendants include the following subsections:

a.  Verbal harassment alone does not rise to the level of a constitutional violation;

b.  PREA does not create a private cause of action;

c.  Denial of toiletries on a single occasion does not rise to the level of constitutional violation; and

4

       d.    The amount of force exercised by the correctional officers was necessary and reasonable, was applied in good faith to restore discipline, and did not cause Plaintiff any significant injury.

(ECF No. 21 at 2). As to the first ground, Defendants provide documentation pertaining to administrative remedies filed by Alshurafa. (ECF No. 21-1 at 113-21). Defendants point out that Alshurafa filed seven grievances during his stay at FCI McDowell. The first remedy filed by Alshurafa that arguably pertains to the allegations in this civil action was filed on September 21, 2020, three days after Alshurafa filed his amended complaint in the case, and more than one month after the action was instituted. (ECF No. 24 at 13). Defendants assert that Alshurafa's remedy was rejected, and he failed to take the proper steps to complete the administrative review process. (*Id.* at 14). Defendants argue that exhaustion is mandatory before an inmate may file a civil action. Therefore, Alshurafa's failure to complete the process prior to instituting this matter requires dismissal.

    With respect to the second ground, Defendants contend that the implied damages remedy available pursuant to *Bivens* is limited, and any extension of the remedy should be taken cautiously. Defendants posit that the claims asserted by Alshurafa do not fall within the three recognized contexts of *Bivens*, and there are alternative remedies available to Alshurafa. (*Id.* at 15-25). For that reason, and for other associated reasons set out by Defendants, they claim that Alshurafa's complaint should be dismissed.

    Next, Defendants argue that Alshurafa has failed to state a compensable claim. Defendants assert that, during the investigation into his PREA allegation, Alshurafa changed or recanted several of the core allegations he makes in the amended complaint. (*Id.* at 26-27). Moreover, Defendants contend, the documentation provided by the Federal Bureau of Prisons ("BOP"), directly contradicts statements made by Alshurafa. In particular, Defendants refer to the videotape taken during the use-of-force incident

on June 22, 2020, which they believe confirms that Alshurafa fabricated his claim of excessive force, as well as the claim that his genitals were exposed to female staff. (ECF No. 24 at 27).

In regard to the first three subsections of the third ground for dismissal, Defendants state that even assuming Alshurafa was verbally harassed, denied toiletries, and made to wear a revealing jumpsuit, none of these situations gives rise to a constitutional violation cognizable in a *Bivens* case. (ECF No. 24 at 28). Defendants argue that verbal harassment alone does not rise to the level of an actionable offense, nor does a single episode in which toiletries are denied to an inmate. Defendants add that Alshurafa's complaint regarding an alleged PREA violation cannot be maintained in this action, because PREA does not create a private cause of action. *(Id.* at 29).

As to the last subsection, Defendants argue that Alshurafa has not demonstrated that the correctional officers used excessive force. *(Id.* at 30-32). Defendants explain that a tactical team was assembled when Alshurafa refused to remove the covering from his cell window. Inmates are not permitted to cover the window, because it prevents the guards from being able to maintain order and safety. The OC spray was deployed due to Alshurafa's repeated failure to comply with orders. Once in cuffs, he was immediately decontaminated. Furthermore, when Alshurafa complained about his wrist restraints being too tight, the restraints were promptly loosened. He was placed in a cell with the restraints in place, because he refused to calm down and cooperate. Defendants indicate that once Alshurafa demonstrated restraints were no longer necessary, they were removed. *(Id.* at 32).

Finally, as the fourth and final ground, Defendants argue that they are entitled to qualified immunity. (ECF No. 24 at 32-34). They assert that the facts do not demonstrate

that the defendants infringed on a clearly established right of Alshurafa. As such, Defendants claim that they are immune from liability.

## III.    <u>**Significant Documentation Produced by Defendants**</u>

Other than his verified amended complaint, Alshurafa has not offered any evidentiary support for his claims. Moreover, he has not filed any opposition to Defendants' motion for summary judgment and has not challenged the accuracy, credibility, or reliability of the documentation provided by Defendants in support of their motion. Defendants have submitted the following materials:

1. A Declaration of Lieutenant Hendrick, which states: Alshurafa was one of several inmates who covered their cell windows on the afternoon of June 22, 2020. (ECF No. 21-1 at 2-7). Inmates are not permitted to cover their windows, because it prevents staff members from observing the inmates to ensure their safety and compliance with BOP policies. Defendant Connelly proceeded to Alshurafa's cell to see what was going on. Alshurafa was upset that no hot meals had been served that day. Because some inmates refused to remove the covering from their cell windows when ordered to do so, a use of force team was assembled to enter the cells and remove the disruptive inmates. Before applying force, the team used confrontation avoidance techniques. When Alshurafa still refused to remove the window covering as ordered, staff opened the slot in Alshurafa's cell door and deployed chemical munitions into the cell.

Alshurafa then complied and was removed from the cell. He was decontaminated and assisted into alternative clothing. No females were present in the room at the time that Alshurafa's clothes were changed, and female staff could not see Alshurafa changing clothes from their stations outside of the room. When the change was completed, Alshurafa's genitals were covered. The use of alternative clothing is appropriate when an

inmate is in an agitated state, because it prevents the inmate from having access to material that can be used to harm himself or others. Alternative clothing is made of a paper-like material and is not used to punish or humiliate inmates. It is used for inmate and staff safety and is purchased from approved vendors. Alshurafa was kept in wrist restraints until he was calm and cooperative. Alshurafa complained that the restraints were tight at first, but they were promptly loosened. Alshurafa was disciplined for the incident.

Approximately two weeks after the incident, Alshurafa was seen by medical staff for an unrelated chronic condition, and he made no complaints of pain or injuries related to the restraints. (ECF No. 21-1 at 2-7). He was also seen twenty days after the incident by the psychology staff for a 30-day SHU review. He did not report any problems or concerns related to his placement in the SHU. On August 3, 2020, more than one month after the incident, Alshurafa filed a PREA allegation related to the June 22, 2020 clothing change. During the investigation of the PREA allegation, Alshurafa conceded that female staff were not present during the changing of his clothes and acknowledged that the boxers and jumpsuit covered his genitalia, although he claimed the garments were too small. The PREA report was deemed unfounded. Lieutenant Hendrick represents that inmates in wrist restraints are able to use the restroom, and Alshurafa was provided with toilet paper, but refused it, and decided to wait until later to use the restroom. (*Id.*)

2. A Form 583 Report of Incident, which identifies Alshurafa and another inmate as the instigators of the disruption that occurred around 2:00 p.m. on June 22, 2020. Alshurafa was accused of inciting other inmates in A range to cover their cell windows. (ECF No. 21-1 at 16-20). As nine inmates had covered their windows, the Warden authorized the assembly of a calculated use of force team and various munitions, if

necessary. The use of force team ordered Alshurafa to remove the window covering and submit to restraints, which he refused to do. Accordingly, OC was sprayed into his cell, causing Alshurafa and his cellmate to submit. Alshurafa was placed in restraints at around 4:00 p.m., decontaminated, medically assessed, dressed in alternative clothing, and put in a cell separate from other inmates. (ECF No. 21-1 at 16-20).

3.  Three video recordings showing the events as they occurred on June 22, 2020. The first video recording captures the assembly of the use of force team; their approach to Alshurafa's cell; his response; the apparent deployment of OC spray into the cell; Alshurafa's removal from the cell; the guards escorting Alshurafa to the shower; the decontamination; the guards escorting Alshurafa to another room in order to facilitate his change into alternative clothing; his complaints regarding the size of the boxer shorts; the problem with the tightness of the wrist restraints and the correction of that problem; and Alshurafa's placement in a separate cell. (ECF No. 21-1 at 21; ECF No. 27 at 1). From the vantage point of the individual taking the video, during the clothing change, Alshurafa was surrounded by male guards, with his front facing the wall. His genitals were not exposed and cannot be seen, because only his back was visible to the camera. Alshurafa was briefly released from the cuffs in order to get his arms into the jumpsuit. Throughout the change of clothing, Alshurafa remained standing with the front of his body facing the wall and surrounded by male guards. The handcuffs were again placed on Alshurafa and he proceeded to complain that they were too tight. During this process, Alshurafa's chest was visible, because the jumpsuit had not been zipped up all of the way; however, his genitalia were not exposed. At this point, a female staff member appeared to verbally assist with cuff placement, and it is clear on the video that Alshurafa's genitals were fully covered by the jumpsuit and boxers. Alshurafa was medically assessed and led to a cell.

The second video recording provides a closer view of Alshurafa's cell door just prior to the use of OC spray. The cell window was covered with an orange cloth. The guard gave instructions to Alshurafa, who looked out, but did not remove the covering or otherwise comply. OC spray was introduced through a slot in the door, causing Alshurafa to remove the covering, and he and his cellmate to submit to handcuffs. The third recording includes statements by the use of force team made after the incident in which they summarily recounted what occurred.

4. A copy of Alshurafa's inmate disciplinary record, which reflects that he admitted on August 10, 2020 to violating code 307/212 in relation to covering his cell window. (ECF No. 21-1 at 23). Code 212 is engaging in a group demonstration. Alshurafa lost 27 days of good conduct credit, and received other punishments. (ECF No. 21-1 at 23).

5. A fifteen minute restraints check form, documenting checks on Alshurafa while in ambulatory restraints. (ECF No. 21-1 at 27-28; ECF No. 33-1 at 5-6). The form begins at 4:05 p.m. and continues until 11:32 p.m. when the restraints are removed.

6. A Two-Hour Lieutenant Restraint Check Form, which indicates that Alshurafa had leg restraints removed at 9:42 p.m. and wrist restraints removed approximately two hours later when he showed a pattern of self-control and compliance with staff orders. (ECF No. 21-1 at 29-30; ECF No. 33-1 at 8-9). The record documents that Alshurafa received a medical assessment at some time before 9:42 p.m.

7. A Health Services Restraint Review Form, which shows that two medical assessments were performed on Alshurafa while he was restrained. (ECF No. 21-1 at 31; ECF No. 33-1 at 11). The first examination was performed at 4:05 p.m. and noted good circulation with no apparent injuries. The second examination was performed at 8:31 p.m. and noted a capillary refill of less than 3 (refill of 1 to 2 is normal), no evidence of injury,

10

and no signs or symptoms of distress.

8.  A Health Services Clinical Encounter form that was completed on June 22, 2020 by Robert Bailey, R.N., at 6:42 p.m. (ECF No. 21-1 at 33-34; ECF No. 33-1 at 15-16). Nurse Bailey notes that Alshurafa was acceptably decontaminated after the OC spray. His lungs were clear. Nurse Bailey adds that the restraints were initially placed too tight, but after adjustment, were in satisfactory position. There were no neurovascular concerns or significant findings.

9.  A Form 586 After Action Review Report, which assesses the actions of the use of force team. (ECF No. 21-1 at 36-37). The form concluded that the use of force was reasonable and appropriate, although Captain Wimbush should not have been involved in the use of force; confrontation avoidance was not videotaped; the staff did not stay together; the restraints were not applied by the proper person; and the staff continued to wear gas masks at the debriefing. (*Id.* at 36).

10. A Health Services Clinical Encounter form, reflecting a chronic care visit with Alshurafa performed on July 2, 2020 by Physician's Assistant, Chandra Carothers. (ECF No. 21-1 at 48-50; ECF No. 33-1 at 152-54). Alshurafa made no complaints related to the June 22, 2020 incident, and no abnormal findings were documents.

11.  A Health Services Clinical Encounter form, reflecting a PREA evaluation performed on August 3, 2020 by Robert Alexander, R.N. (ECF 21-1 at 45-47; ECF No. 33-1 at 80-81, 149-51). Alshurafa stated that female staff members were present during the change of his clothing on June 22, 2020, and he felt sexually embarrassed. He denied any physical injuries or contact and had no complaints of pain. (*Id.*).

12.  A Declaration by Dr. William Whited, a staff psychologist at FCI McDowell. (ECF No. 21-1 at 89-91). Dr. Whited confirms that Alshurafa made a PREA allegation on

11

August 3, 2020 in which he claimed that female staff members were present during his change of clothing on June 22, 2020. Dr. Whited summarized his visit with Alshurafa on August 3, 2020, noting that Alshurafa did not want to receive psychological services.

Thereafter, Dr. Whited saw Alshurafa on various occasions for long-term restrictive housing mental health evaluations. (ECF No. 21-1 at 89-91). Alshurafa requested to speak with psychology staff on October 9, 2020. He stated that he was processing the June 22 incident and intended to file a lawsuit over it. Alshurafa expressed no additional mental health issues, however, until December 10, 2020, when he stated that he was stressed, anxious, and depressed. He complained about not being seen by Health Services to address medication issues, but acknowledged that he did not raise these concerns during medical staff rounds. Alshurafa later complained about problems with the administrative remedy process. Dr. Whited did not feel that Alshurafa needed clinical follow-up. (*Id*.).

Attached to Dr. Whited's declaration are records of Alshurafa's care by BOP Psychology Services, which verify that he was seen on August 3, 2020 after making a PREA allegation. (ECF No. 21-1 at 104—05; ECF No. 33-1 at 78-79, 203-04). Alshurafa reported that female staff members were present when his clothes were changed on June 22, 2020, and he believed that they could see his exposed genitals, which made him feel humiliated and sexually embarrassed. He did not display any psychological signs and symptoms, did not express any concerns about his safety, and denied having any current mental health issues. (*Id*.). The records additionally show that Alshurafa refused his six-month Long-Term Restrictive Housing Mental Health Evaluation on August 21, 2020, denying that he had any mental health issues and stating that he did not need to speak with psychology services.

Although Alshurafa was seen monthly for restrictive detention reviews, the records reflect that he did not make specific complaints concerning his mental health until October 9, 2020, when he stated that he was going through a "rough time" related to the PREA allegation and other events occurring with his family. (ECF No. 21-1 at 98; ECF No. 33-1 at 195-96, 197-99, 200, 202, 205). Alshurafa indicated that he had filed administrative remedy forms, BP-8s and BP-9s, related to the officers' use of excessive force on June 22, in addition to the PREA allegation. He complained about having sleep disturbance since being placed in the SHU and wanted medication to help him sleep. (*Id.*).

On December 10, 2020, Alshurafa was seen by Dr. Whited for a clinical intervention. (ECF No. 33-1 at 193-92). Alshurafa's examination was essentially normal, although his mood was irritable. He reported feeling stressed, anxious, and depressed, but conceded that he had not communicated these symptoms earlier. He complained about issues with submitting BP-8s and BP-9s and seemed primarily focused on what he perceived to be the "double standard" at FCI McDowell where staff held inmates accountable, but did not hold themselves accountable. (*Id.*). Dr. Whited felt that Alshurafa was mentally stable, did not meet criteria for any psychological disorder, and would only require care on an "as needed" basis. During a Psychology Services SHU Review performed on December 18, 2020, Alshurafa expressed no concerns about his placement in the SHU and showed no evidence of psychiatric distress or mental deterioration. (ECF No. 33-1 at 192).

13. A Declaration of Destiny Spearen, Paralegal for the Consolidated Legal Center at FCI McDowell, stating that Alshurafa did not file any administrative remedy related to the June 22, 2020 incident until September 21, 2020, which was two days after he filed the amended complaint in this action. (ECF No. 21-1 at 113-15). Ms. Spears indicates that,

pursuant to the BOP's policy on administrative remedies, Alshurafa had twenty days after the event occurred in which to file a remedy, so the last day he could properly submit one related to the events of June 22 was on July 11, 2020. (ECF No. 21-1 at 113-15). He could have requested an extension of that date for good cause, but did not do so.

14. A second Declaration of Destiny Spearen, Paralegal, confirming that there are no video recordings retained or retrievable to corroborate Alshurafa's representation that he attempted to submit administrative remedies, which were never formally acknowledged. (ECF No. 33-1 at 2-3).

15. Twenty-five memoranda prepared by members of the use of force team documenting the events of June 22, 2020. (ECF No. 33-1 at 18-46).

16. A January 12, 2021 memorandum prepared by Lieutenant Hendrick reviewing Alshurafa's PREA allegation. (*Id.* at 74). The memorandum states that on August 3, 2020, Alshurafa submitted the PREA allegation, claiming that female staff were present during his change of clothing. He identified the three females as Defendant Wimbish, Secretary Sweeney, and Case Manager Hill. According to the memorandum, Alshurafa later recanted his statement that the female staff members were actually present in the room, but claimed instead that they were in a position outside of the room where they could see him changing. Hendrick indicated that video evidence did not support the PREA allegation, and the allegation should be considered unfounded. (*Id.*).

17. Memoranda prepared on August 3-4, 2020 by Lieutenant Smith, Lieutenant Connolly, Captain Wimbish, Secretary Sweeney, and Case Manager Hill, discussing the PREA allegation and denying that female officers were in a position to observe Alshurafa's genitals during his clothing change. (ECF No. 33-1 at 76-77, 82, 83, 84-86).

18. Health Services Clinical Encounter records from the Oklahoma Transfer

Facility and Federal Correctional Complex ("FCC") Victorville, which do not reflect any mental or physical complaints related to the events at FCI McDowell. (ECF No. 33-1 at 134-37, 142, 158-63).

19. A Psychology Services Transfer Intake Screening form prepared at FCC Victorville on February 11, 2021 upon Alshurafa's transfer to that facility. (*Id.* at 191). Katie Dorsey, PsyD, noted that Alshurafa had no current mental health concerns. His mood was calm and consistent with his verbal presentation; his hygiene and eye contact were within normal limits; his thought processes were logical and goal-oriented; and he displayed no symptoms of psychological impairment or distress. Alshurafa denied any history of mental health issues and was not taking any psychotropic medications. He also denied being the victim or perpetrator of sexual assault while in BOP custody or outside. Dr. Dorsey concluded that Alshurafa did not require mental health care. (*Id.*).

20. Two incident reports and staff memoranda detailing the events of June 22, 2020, which were part of the disciplinary proceeding against Alshurafa for disruptive behavior. (ECF No. 33-1 at 230-46). Included in the proceedings was a memorandum of Correctional Counselor Lilly, who stated that he tried confrontational avoidance with Alshurafa prior to assembly of the use of force team, and Alshurafa did remove his window covering for five minutes, but immediately covered the window again as Lilly left the SHU. (*Id.* at 247).

21. The Disciplinary Hearing Officer's ("DHO") report in which the DHO found Alshurafa guilty of engaging or encouraging a group demonstration. (*Id.* at 221-23). The DHO reviewed the evidence, including Alshurafa's statement admitting that he covered his cell window in protest for not receiving commissary or a hot meal at lunch.

IV.    **Standards of Review**

In their combined motion to dismiss and for summary judgment, Defendants argue that some of Alshurafa's claims should be dismissed under Fed. R. Civ. P. 12(b)(1), because the Court lacks subject matter jurisdiction over them; other claims should be dismissed under Fed. R. Civ. P. 12(c), because they fail to state a claim for which relief may be granted; and the remaining portions of Alshurafa's amended complaint should be summarily dismissed under Fed. R. Civ. P. 56, because the record, when taken as a whole, could not lead a rational trier of fact to find for Alshurafa. (ECF No. 24 at 9-11). Accordingly, the requirements of each rule are examined in turn.

### A.  *Federal Rule Civil Procedure 12(b)(1)*

A Rule 12(b)(1) motion challenges the court's subject matter jurisdiction over a cause of action. Such a motion may be presented in two ways. First, the movant may claim that the jurisdictional allegations of the complaint are not true. *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir. 1982). In that case, the court "is to regard the pleadings as mere evidence on the issue, and may consider evidence outside of the pleadings without converting the proceeding to one for summary judgment. *Richmond, Fredericksburg & Potomac R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams,* 697 F.2d at 1219). Second, the movant may contend, as the defendants have done in this case, that the "complaint simply fails to allege facts upon which subject matter jurisdiction can be based." *Adams,* 697 F.2d at 1219. When presented with this contention, the court assumes that the allegations in the complaint are true and affords the plaintiff the same procedural protection he would receive under Fed. R. Civ. P. 12(b)(6). *Id.* The burden of proving that the court has subject matter jurisdiction rests with the plaintiff as he is the party asserting it. *Johnson v. North Carolina,* 905 F.Supp.2d 712, 719 (W.D.N.C. 2012).

However, the court should grant dismissal "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.*

### B. Federal Rules of Civil Procedure 12(b)(6)

A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017). Rule 12(b)(6) permits the court to dismiss a complaint that fails to state a claim for which relief may be granted. A complaint fails to meet the requisite pleading standard, when viewing the factual allegations as true and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The "plausibility" standard is further explained in *Iqbal* as follows:

> The plausibility standard is not akin to a "probability requirement," but asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief."

*Iqbal,* 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 1955) (internal citations omitted). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal,* 556 U.S. at 679. Determining whether a complaint states a facially plausible claim for relief is a "context-specific task that requires the court to draw on its judicial experience and common sense." *Id.* (citing *Iqbal v. Hasty,* 490 F.3d 143, 157–158 (2nd Cir. 2007)).

When deciding a Rule 12(b)(6) motion, the court must accept as true all of the

factual allegations contained in the complaint and must "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *also Erickson v. Pardus,* 551 U.S. 89 (2007). Nonetheless, the court is not required to accept the legitimacy of legal conclusions, even those couched as factual allegations. *Iqbal,* 556 U.S. at 678. "A court decides whether [the plausibility] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to relief. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011). To survive a motion to dismiss, a complaint must plead both a factual and legal basis for relief. *Iqbal,* 556 U.S. at 678. ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to establish a facially plausible complaint).

Courts are required to liberally construe *pro se* complaints, such as the one filed in this action. *Erickson,* 551 U.S. at 94. However, even under this less stringent standard, the complaint must contain sufficient factual allegations to support a valid legal cause of action. *Bass v. E.I. Dupont de Nemours & Co.,* 324 F.3d 761, 765 (4th Cir. 2003). The court may not rewrite the pleading to include claims that were never presented, *Parker v. Champion*, 148 F.3d 1219, 1222 (10th Cir. 1998), construct the plaintiff's legal arguments for him, *Small v. Endicott,* 998 F.2d 411, 417-18 (7th Cir. 1993), or "conjure up questions never squarely presented" to the court. *Beaudett v. City of Hampton,* 775 F.2d 1274, 1278 (4th Cir. 1985). A Rule 12(b)(6) motion should be granted only "'where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.'" *Hartmann v. Calif. Dept. of Corr. & Rehab.,* 707 F.3d 1114, 1122 (9th Cir.2013) (citing

*Mendiondo v. Centinela Hosp. Med. Ctr.,* 521 F.3d 1097, 1102 (9th Cir.2008)).

### C. Federal Rule of Civil Procedure 56

Summary judgment is proper under Fed. R. Civ. P. 56 when no genuine issue of material fact is in dispute, and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law," and a disputed issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. The party moving for summary judgment bears the initial burden of showing "an absence of evidence that demonstrates the existence of a genuine issue of fact for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

If the moving party meets this burden, then the burden shifts to the nonmoving party, who "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322, n.3. The nonmoving party must do more than rely upon the allegations or the denial of allegations contained in his pleadings to defeat a motion for summary judgment; instead, he must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256. Concrete evidence includes "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The court must not resolve disputed facts, nor weigh the evidence. *Russell v. Microdyne Corp.,* 65 F.3d 1229, 1239 (4th Cir. 1995). Instead, the court must accept as true the facts asserted by the nonmoving party and review the evidence "draw[ing] all justifiable inferences" in its favor. *Masson v. New*

*Yorker Magazine, Inc.,* 501 U.S. 496, 520 (1991).

Even still, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson,* 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano,* 557 U.S. 557, 586 (2009), (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Thus, while any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co*, 475 U.S. at 587, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249-50).

## V.   **Discussion**

As stated, Defendants provide four broad grounds in support of their dispositive motion, which are addressed below.

### A.   *Alshurafa Failed to Exhaust Administrative Remedies*

Defendants assert that Alshurafa failed to exhaust administrative remedies, and they provide documentation in support of that position. Specifically, Defendants claim that Alshurafa's first administrative remedy pertaining to the June 22, 2020 incident was not submitted until September 21, 2020, well past the deadline for initiating the administrative remedy process. Defendants further state that Alshurafa never followed up on his administrative remedy by filing the proper paperwork, so his claims were not exhausted. Alshurafa represented at the motion hearing that he did submit all of the necessary forms—BP-8, BP-9, BP-10, and BP-11—but his efforts were thwarted by correctional staff. Alshurafa indicated that there should be video surveillance

20

documenting his efforts to exhaust administrative remedies.

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA"), requires inmates to exhaust administrative remedies prior to filing a complaint in federal court. 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see, also, Porter v. Nussle,* 534 U.S. 516, 524 (2002) ("Once within the discretion of the district court, exhaustion in cases covered by § 1997e(a) is now mandatory. All available remedies must now be exhausted; those remedies need not meet federal standards, nor must they be plain, speedy, and effective. Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit.") (citations and internal quotation marks omitted)). The exhaustion requirement applies to cases filed pursuant to *Bivens*, as well as to other civil rights actions. *Sallee v. Joyner*, 40 F. Supp. 2d 766, 768 (E.D. Va. 1999). However, administrative exhaustion is "not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner." *Hart v. Roderick,* No. CV GLR-15-2054, 2016 WL 3940219, at *3 (D. Md. July 21, 2016) (citations omitted). Instead, exhaustion is an affirmative defense, and the defendant bears the burden of proving that a prisoner failed to exhaust administrative remedies. *Id.*

The Supreme Court of the United States has repeatedly held that courts may not read futility or other exceptions into the PLRA that are not part of its textual mandate. *Ross v. Blake,* 136 S. Ct. 1850, 1857 (2016) (holding that "[m]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.") Nevertheless, the Supreme Court pointed out that the PLRA does contain one explicit

exception to the exhaustion requirement; an inmate need not exhaust "unavailable" remedies. *Id.* at 1858. The Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide relief to aggrieved inmates." *Id.* Second, an administrative process is likewise unavailable when it is "so opaque" that "no ordinary prisoner can discern or navigate it." *Id.* Finally, an inmate need not exhaust administrative remedies when prison officials thwart the inmate's access to the grievance procedure "through machination, misrepresentation, or intimidation." *Id.* at 1860. "[S]uch interference with an inmate's pursuit of relief renders the administrative process unavailable." *Id.*

The BOP has developed a four-step administrative process to address inmate grievances. *See* 28 C.F.R. § 542.10, *et seq*. First, the inmate is required to seek informal resolution of the issue with facility staff by filing Request for Administrative Remedy Form BP-8. If that step proves fruitless, the inmate proceeds to the second step, which requires him to file a written Form BP-9 addressed to the warden of the facility. *Id.,* at § 542.14(a). The BP-9 must be submitted within twenty days of the occurrence on which the grievance is based. *Id.* If the warden provides an unsatisfactory response, the inmate has twenty days to appeal to the BOP's Regional Director, using Form BP-10. *Id.,* at § 542.15(a). If the Regional Director's response does not resolve the matter, the inmate must seek relief by appealing the Director's response within thirty days to the Office of General Counsel, using Form BP-11. *Id.* An unresolved grievance is not exhausted until the inmate has performed all four steps. *Gibbs v. Bureau of Prison Office,* 986 F. Supp.

941, 943 (D. Md. 1997).

From the evidence provided to the Court, after the events of June 22, 2020, Alshurafa did not file a Request for Administrative Remedy Form until September 21, 2020, which was 91 days later and more than a month after he initiated the instant action. (ECF No. 1; ECF No. 21-1 at 113-21).  Accordingly, Alshurafa did not timely file his request for administrative remedy related to the events of June 22, 2020. There is no indication that Alshurafa requested an extension of the filing deadline, and Destiny Spearen, FCI McDowell's paralegal, states in her declaration that Alshurafa did not do so. Ms. Spearen also affirms that when Alshurafa's September request for remedy was denied, he failed to complete all four steps of the administrative process. (*Id*. at 114). Alshurafa has not submitted any documentation or testimony to challenge this evidence. He did assert at the motion hearing that he was unable to exhaust his remedies, because the staff at FCI McDowell either refused to provide him with the proper forms, or refused to properly acknowledge them. However, other evidence and statements by Alshurafa are inconsistent with that assertion.

A review of the record reflects that Alshurafa did complain to Dr. Whited about having problems with submitting BP-8 and BP-9 forms. This conversation did not occur until ***December 18, 2020***. (ECF No. 33-1 at 192-93). On the same day, Alshurafa submitted a request for administrative remedy alleging that FCI McDowell staff were not processing his BP-8 and BP-9 forms. (ECF No. 21-1 at 121). Notwithstanding these complaints, no evidence exists in the record that Alshurafa experienced difficulties submitting administrative remedy requests during the relevant time period of June 22, 2020 through July 11, 2020. To the contrary, Alshurafa represented in the amended complaint that he was able to submit a BP-8 and BP-9 regarding the allegations in his

23

complaint. (ECF No. 5 at 3). Alshurafa states in his verified amended complaint that he presented the facts relating to the complaint in the prisoner grievance procedure, "was not satisfied with responses Level One and Level Two," appealed those responses and "never heard back from Level Three." (ECF No. 5 at 3). He states that the lack of response at Level Three prompted him to file the amended complaint. Alshurafa's representations in the amended complaint thus confirm that he was able to file requests for administrative remedy prior to filing his complaint, received responses to at least his BP-8 and BP-9 forms, and that he gave up at the third step, even though the BOP's process has four steps.

Given the uncontroverted evidence, which includes Alshurafa's own statements, the undersigned **FINDS** that Defendants are entitled to summary judgment on this ground. *See, e.g., Pickens v. Lewis*, No. 1:15-CV-275-FDW, 2017 WL 3277121, at *4 (W.D.N.C. Aug. 1, 2017) ("Courts within the Fourth Circuit (and in sister circuits) hold that unsubstantiated and conclusory assertions by prisoner-plaintiffs that prison grievances were hindered, without providing any details regarding the date the alleged grievances were submitted or to whom they were submitted, fail to create a genuine issue of material fact sufficient to withstand summary judgment."); *Salazar v. Holder*, No. 3:14-CV-23, 2015 WL 574800, at *5 (N.D.W. Va. Feb. 11, 2015) (rejecting the plaintiff's contention that BOP staff actively prevented him from exhausting administrative remedies, because plaintiff's contention contradicted other statements made by him, and it was not supported by any evidence); *Bryan v. S.C. Dep't of Corr.*, No. 4:08-cv-1590-TLW-TER, 2009 WL 702864, at *3 (D.S.C. Mar. 16, 2009) ("The fact that a grievance was unprocessed, without more, is insufficient to show that [prison officials] prevented [a prisoner] from exhausting his administrative remedies.").

### B.  Alshurafa's Complaint Fails to State a Compensable Claim

Pursuant to the provisions of 28 U.S.C. § 1915A, when a case is brought by a prisoner seeking "redress from a governmental entity or officer or employee of a governmental entity," the court must dismiss the case, or any part of it, if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e). A "frivolous" case has been defined as one which is based upon an indisputably meritless legal theory, *Anders v. California*, 386 U.S. 738, 744 (1967); *Denton v. Hernandez,* 504 U.S. 25 (1992), or lacks "an arguable basis either in law or fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). Likewise, a complaint fails to state a compensable claim, and therefore should be dismissed, when viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Supreme Court further explained the "plausibility" standard in *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. Consequently, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679.

Defendants contend that Alshurafa's amended complaint lacks any plausible claim, and provide multiple reasons for that contention. First, Alshurafa's allegation that he was verbally harassed by correctional staff, even if true, does not establish a constitutional violation. Similarly, Defendants assert, even if Defendant Johnson refused to provide Alshurafa with toilet paper, this would not constitute an actionable claim;

particularly, when it occurred on a single occasion and caused no discernable injury. Defendants additionally contend that Alshurafa cannot prosecute a PREA claim, because PREA does not create a private cause of action. Finally, Defendants argue that the force used by Defendants was reasonable and necessary in view of Alshurafa's disruptive behavior, as demonstrated on the video recordings. Defendants' contentions are addressed below.

### 1. Verbal Harassment and the Isolated Denial of Toiletries

Alshurafa claims that Defendant Johnson refused to provide him with toilet paper while he was in restraints. Johnson refutes this contention, stating that he did provide toilet paper upon Alshurafa's request. Although there is a factual dispute regarding this claim, the matter in dispute is not material to a resolution of the claim. While a "deprivation of toiletries, and especially toilet paper, can rise to the level of unconstitutional conditions of confinement," *Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir. 2003) [citations omitted], a denial of toiletries for a *temporary* period must be accompanied by an actual physical injury resulting therefrom in order to be actionable. *Ash v. Greenwood*, No. 2:17-CV-03022, 2018 WL 4201398, at *6 (S.D.W. Va. Aug. 30, 2018) (citations omitted); *also Salmons v. W. Reg'l Jail Auth.*, No. CV 3:18-1447, 2019 WL 5616916, at *6 (S.D.W. Va. Oct. 30, 2019) ("courts have broadly held that the temporary deprivation of toiletries does not violate the Eighth Amendment.") (citations omitted). Alshurafa does not describe a specific injury related to his alleged lack of toilet paper during the seven hours he was held in wrist restraints. Accordingly, the undersigned **FINDS** that Alshurafa fails to state a plausible claim related to the temporary lack of toilet paper.

26

Similarly, Alshurafa's broad allegation that he was the victim of "taunting" by correctional staff after the June 22, 2020 incident fails to rise to the level of a constitutional violation. *Ajaj v. United States*, 479 F. Supp. 2d 501, 538, n. 16 (D.S.C. 2007) ("To the extent Plaintiff is, in addition to physical abuse, also complaining about verbal harassment or taunting, even if there was evidence to support such a claim, no constitutional violation has been shown.") (collecting cases). No matter how inappropriate, unprofessional, or reprehensible, profanity, idle threats, and taunting that are unaccompanied by an injury do not constitute violations of a federally protected right. *See Aziz Zarif Shabazz v. Pico,* 994 F. Supp. 460, 474 (S.D.N.Y.1998). Because Alshurafa claims verbal harassment without a specific injury, the undersigned **FINDS** that this claim must also be dismissed as a matter of law.

### 2.  Alshurafa's Claim Related to his PREA Allegation

Alshurafa alleges that his constitutional rights were violated when correctional officers allowed female staff members to observe the changing of Alshurafa's clothes. Alshurafa asserts that he was stripped naked and his genitals were exposed during this process, even though female staff members were present. The video recordings simply do not support Alshurafa's version of the facts. To the contrary, the most relevant video recording shows that, during the clothing change, Alshurafa was standing with his face and the front of his body against the wall. He was surrounded by male guards, who blocked the view of any potential spectators. When Alshurafa was turned around, his genitalia were fully covered by the boxers and jumpsuit and were not visible.

In any event, Alshurafa's claim must fail, because there is no private cause of action under PREA. *See Worley v. Ewing*, No. 2:19-CV-00543, 2021 WL 951704, at *4 (S.D.W. Va. Mar. 12, 2021) (citations omitted). As this Court explained in *Worley:*

> PREA is a federal law designed to reduce incidents of sexual misconduct in our nation's correctional facilities through federal funding and educational initiatives. It requires corrections and law enforcement agencies to enhance education, investigation, protection, prevention, and prosecution of sexual offenses. In 2012, the U.S. Department of Justice published national PREA standards for all prisons, jails, lockups, and detention facilities in the United States. However, these provisions do not create any private right of action for prisoners to sue correctional staff for alleged sexual misconduct.

*Id.* In the absence of a private right of action, the undersigned **FINDS** that Alshurafa's claim based upon his PREA allegation must be dismissed as a matter of law.

### 3. The Force Used by Defendants was not Excessive

The parties agree that Alshurafa covered his cell window on June 22, 2020 in protest, and that this act was a violation of BOP policy. There is no dispute that the policy exists to allow prison staff to see into the inmates' cells, so that order and safety can be maintained, both of which are essential to prison operations. The video recordings and related investigatory materials reflect that Alshurafa did not remove the window covering or submit to wrist restraints, even when ordered to do so, until after OC spray was introduced into his cell.

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment" to the United States Constitution. *Farmer v. Brennan,* 511 U.S. 825, 833 (1994) (internal citations omitted).[1] The use of excessive force against an inmate by a correctional officer plainly violates the Eighth Amendment's cruel and unusual punishment clause. *Wilkins v. Gaddy,* 559 U.S. 34 (2010). Generally, to establish a constitutional claim of excessive force, a plaintiff must

---

[1] "A *Bivens* claim is analogous to a claim brought against state officials under 42 U.S.C. § 1983; therefore, caselaw involving § 1983 claims is applicable in *Bivens* actions, and vice versa." *Ajaj v. United States*, 479 F. Supp. 2d 501, 535 (D.S.C. 2007).

show that the accused correctional officer "inflicted unnecessary and wanton pain and suffering." *Taylor v. McDuffie,* 155 F.3d 479, 483 (4th Cir.1998) (quoting *Whitley v. Albers,* 475 U.S. 312, 320 (1986)). The claim contains both an objective and subjective component.

To satisfy the objective component, the plaintiff must demonstrate that the force applied by the officer was "sufficiently serious." *Williams v. Benjamin,* 77 F.3d 756, 761 (4th Cir. 1996). "This is not a high bar, requiring only something more than '*de minimus*' force." *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019) (quoting *Hudson v. McMillian,* 503 U.S. 1, 10 (1992)). While "mere threats or verbal abuse, without more, do not state a cognizable claim," *Wilson v. McKeller,* 254 F. App'x 960, 961 (4th Cir. 2007) (citing *Northington v. Jackson,* 973 F.2d 1518, 1524 (10th Cir. 1992)), "'nontrivial force'" is sufficient to state a claim under the Eighth Amendment. *Brooks,* 924 F.3d at 112 (quoting *Wilkins,* 559 U.S. at 39).

As to the subjective element of an excessive force claim, the plaintiff must show that the officer "acted with a sufficiently culpable state of mind." *Williams,* 77 F.3d at 761. This is a "demanding standard," because the "state of mind required ... is wantonness in the infliction of pain." *Brooks,* 924 F.3d at 112. When a prison official "maliciously and sadistically use[s] force to cause harm, contemporary standards of decency always are violated whether or not significant injury is evident." *Wilkins,* 559 U.S. at 37 (explaining that the "core judicial inquiry" is whether the force "was applied ... maliciously and sadistically to cause harm.") (quoting *Hudson,* 503 U.S. at 7). Prison officials act with "a permissible motive—not only when they confront immediate risks to physical safety, but also when they attempt to preserve internal order by compelling compliance with prison rules and procedures." *Brooks,* 924 F.3d at 113 (citation and internal markings omitted).

29

"But corrections officers cross the line into impermissible motive—using force maliciously and for the very purpose of causing harm—when they inflict pain not to induce compliance, but to punish an inmate for intransigence or to retaliate for insubordination." *Id.* (internal citations and markings omitted).

When considering an excessive force claim, the court must ask if "the force applied was in a good faith effort to maintain or restore discipline" or was simply for the purpose of causing injury. *Taylor,* 155 F.3d at 483 To make this determination, the court should examine the following factors: (1) the need for the application of force; (2) the relationship between the need and the amount of force used; (3) the extent of the injury inflicted; (4) the efforts to temper the severity of the force used; and (5) the extent of the threat to the safety of staff and inmates as reasonably perceived by the responsible officials on the basis of the facts known to them. *Whitley v. Albers,* 475 U.S. 312, 321 (1992). "While excessive force does require malicious intent, it does not require that the prisoner victim suffer a 'significant injury.' ... [A] prisoner who suffers a minor, but malicious, injury may be able to prevail on an excessive force claim." *Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 98 (4th Cir. 2017). The lack of serious injury, however, is not irrelevant to the Eighth Amendment inquiry. *Hudson*, 503 U.S. at 7 ("The absence of serious injury is ... relevant to the Eighth Amendment inquiry, but does not end it."). The extent of the injury provides some indication as to the amount of force applied. *Wilkins*, 559 U.S. at 37. "[N]ot 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" *Id.* (quoting *Hudson*, 503 U.S. at 9). "An inmate who complains of a push or a shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Hudson*, 503 U.S. at 9; *see also Jackson v. Holley*, 666 F. App'x 242, 244 (4th Cir. 2016).

In this case, Alshurafa admits that he was asked by Lieutenant Connelly to remove

his window covering before a use of force team was assembled. Alshurafa refused. The video recordings clearly show that after the team was assembled, Alshurafa was again given an opportunity to comply with orders to remove his window covering and submit to handcuffs, but he chose not to do so. Short bursts of OC spray were introduced into the cell, and Alshurafa was handcuffed. He was immediately taken to the shower for decontamination, was given a change of clothing, and led to a separate cell. Assessing the five factors set forth above in light of the video recordings and related evidence, the undersigned **FINDS** as follows: There are no genuine issues of material fact. Force was necessary to reestablish order in the A range of the SHU, because Alshurafa admittedly refused to uncover his window, which was a clear violation of BOP policy. FCI McDowell staff attempted to reason with Alshurafa, employing confrontational avoidance measures before assembling a use of force team. The limited use of OC spray, as reflected in the video recordings, was appropriate to compel Alshurafa to comply with orders. The health care encounter records and the video recordings substantiate that Alshurafa did not suffer any detectable injury as a result of the OC spray, with the exception of some transitory irritation of his eyes. Alshurafa does not contend otherwise. And finally, Alshurafa's actions created an obvious threat to the safety of staff and inmates. Alshurafa induced other inmates to cover their cell windows, and he covered his own window; thereby, preventing officers from performing one of their core job duties; that being, the observation of inmates confined in a special housing unit.

While it is true that "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not

adopt that version of the facts for purposes of ruling on a motion for summary judgment.'"
*Iko v. Shreve,* 535 F.3d 225, 230 (4th Cir. 2008) (quoting *Scott v. Harris,* 550 U.S. 372,
378-80 (2007). In cases where, as here, the record contains an unchallenged videotape
capturing the events in question, the court must only credit the plaintiff's version of the
facts "to the extent it is not contradicted by the videotape." *Id.* As indicated, the video
recordings unequivocally demonstrate that the use of force in this case was reasonable
and necessary to restore order in the A range. Force was not used until after Alshurafa
was given a chance to comply with BOP policies. Alshurafa admits that his actions violated
BOP policy and that he was asked by several different staff members, over an extended
period of time, to remove his window covering. Therefore, the undersigned **FINDS** that
Alshurafa's complaint based upon the use of OC spray is without merit and should be
dismissed.

Alshurafa also complains that his wrist restraints were too tight, and the
correctional officers did not sufficiently loosen them despite Alshurafa's repeated
requests. However, one of the video recordings submitted by Defendants captures the
exchange between Alshurafa and staff concerning the handcuffs and reflects that
Alshurafa's complaints were promptly addressed. The handcuffs were loosened twice and
checked by several officers. The actions of the correctional staff, as documented on the
video recording, reflect the opposite of "a culpable state of mind" or "wantonness in the
infliction of pain." For this reason, Alshurafa cannot satisfy the subjective component of
his claim. In addition, Alshurafa was examined by medical personnel, who stated that the
handcuffs were loosened and were not causing harm. The video confirms that after the
cuffs were loosened twice, Alshurafa stopped complaining. He did not appear to be in any
discomfort or distress as he was led to a cell. Restraint records prepared during the night

32

do not document any further complaints from Alshurafa about the tightness of the handcuffs, and there is scant evidence of Alshurafa suffering any injury from their initial application. Therefore, the undersigned **FINDS** that Defendants are entitled to judgment in their behalf on this claim.

### C. *Qualified Immunity*

Defendants also argue that they are immune from liability under the doctrine of qualified immunity. Government officials performing discretionary functions may be protected from monetary damages under the doctrine of qualified immunity when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity "is a judicially created doctrine that stems from the conclusion that few individuals will enter public service if such service entails the risk of personal liability for one's official decisions." *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir. 1994). This doctrine protects law enforcement officers in the exercise of their official duties from the risk of personal liability for making "bad guesses in gray areas," ensuring that they are only responsible for "transgressing bright lines." *Marciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir. 1992). As the United States Supreme Court explained in *Pearson v. Callahan:*

> Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

*Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez,* 540 U.S. 551, 567 (2004)). Because qualified immunity is "an immunity from suit rather than a mere

defense to liability," it is "effectively lost if a case is erroneously permitted to go to trial." *Id.* (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)). "Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz,* 533 U.S. 194, 200 (2001).

In determining the applicability of qualified immunity, the court must consider two questions: (1) whether a constitutional or statutory right would have been violated on the facts alleged by plaintiff, and (2) whether the right asserted was clearly established at the time of the alleged violation. *Pearson,* 555 U.S. at 232. These questions may be answered in any order that "[would] best facilitate a fair and efficient disposition of each case." *Id.* at 242. As such, if a court finds that a claimed constitutional right was not clearly established at the time of the alleged wrongdoing, the court may dispose of the case without engaging in the pointless exercise of determining whether the facts alleged actually establish a violation of that right. *Id.* Similarly, if a court determines that the facts alleged by the plaintiff do not support a reasonable inference that a constitutional right was violated, the analysis terminates, and the complaint is subject to dismissal for failure to state a claim.

In this case, as detailed above, Alshurafa has failed to offer evidence to establish that Defendants violated his statutory or constitutional rights. Even assuming that all of Alshurafa's allegations are true and drawing all justifiable inferences in his favor, his allegations alone do not establish such a violation. He has likewise failed to respond to the motion for summary judgment. He does not refute the evidence provided by Defendants, nor demonstrate the existence of a genuine issue of material fact that would preclude summary judgment. In contrast, Defendants have submitted uncontroverted

video recordings that belie Alshurafa's claims. In the absence of evidence showing a statutory or constitutional violation, the undersigned **FINDS** that Defendants are entitled to qualified immunity in this case.

### D.  The Additional Ground for Dismissal Offered by Defendants

Defendants offer one additional ground that they assert entitle them to dismissal of the complaint. Defendants argue that Alshurafa's claims are not cognizable under *Bivens,* because the implied remedy available to federal prisoners is limited, and Alshurafa's claims do not fall within one of the three recognized causes of action under *Bivens*. The undersigned **FINDS** that the Court need not consider this additional ground given the evidentiary record, which clearly shows that Defendants did not violate any federally protected right of Alshurafa.

### VI.  <u>Proposal and Recommendations</u>

For the reasons set forth above, the undersigned respectfully **PROPOSES** that the presiding United States District Judge accept and adopt the findings herein and **RECOMMENDS** that Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, (ECF No. 21), be **GRANTED**; the amended complaint, (ECF No. 5), be **DISMISSED**, with prejudice; and this case be **REMOVED** from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant  the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the

Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Faber, and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to the Plaintiff and counsel of record.

**FILED:** July 1, 2021

Cheryl A. Eifert
United States Magistrate Judge

36